UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA  )
                          )
v.                        )   No. 2:10-cr-159-DBH
                          )
CHASITY COY,              )
                          )
        Defendant         )

## RECOMMENDED DECISION ON MOTION TO SUPPRESS

Chasity Coy, charged with one count of possession with intent to distribute of a mixture or substance containing oxycodone, in violation of 21 U.S.C. § 841(a)(1), Indictment (Docket No. 18), seeks to suppress all evidence secured as a result of the execution of a search warrant at her home in Lewiston, Maine, on June 17, 2010, including statements she made to the law enforcement officers who were present at the time of the search. An evidentiary hearing was held before me on January 20, 2011, at which the defendant appeared with counsel. The government presented two witnesses and offered four exhibits, all of which were admitted without objection. The defendant testified as the sole witness for the defense, which offered no exhibits. After both sides rested, counsel argued orally. I now recommend that the court adopt the following proposed findings of fact and deny the motion.

### I. Proposed Findings of Fact

On June 17, 2010, Officer Wayne Clifford of the Lewiston Police Department, who had been assigned to the Maine Drug Enforcement Agency in 2005 and to the federal Drug Enforcement Administration from 2006 through 2009, was sent by the police dispatcher to meet with a concerned citizen who wanted to provide information concerning drug trafficking. This

1

individual told Clifford that, within the past four days, this individual had seen the defendant selling Oxycontin in her apartment at 20 Howe Street in Lewiston, that she had a gallon-size plastic bag filled with the greenish-blue tablets, and that she had sold a few of the tablets for $240 in cash. Clifford knew from his experience that 80 mg Oxycontin tablets are greenish-blue in color and sell for $1 per milligram, making $240 the correct amount for the sale of three 80 mg tablets. The informant had no criminal charges pending and did not want to be compensated for the information. Clifford did not know this individual to have provided information to law enforcement in the past, but he found details about the defendant provided by the informant to be such that only a person with a personal relationship with the defendant would know.

The defendant had been involved in the following drug-related criminal cases: on October 3, 2005, a consent search of her then-residence at 134 Pierce Street resulted in the seizure of 43 grams of cocaine and 12 grams of crack; on April 5, 2006, Clifford searched the defendant's apartment in accordance with the terms of her release and seized 14 grams of marijuana, as a result of which the defendant was arrested for violation of the conditions of her release; on June 12, 2006, Clifford assisted in the controlled purchase of 3 bags of cocaine from the defendant in the same residence, while the defendant was out on pre-conviction bail on the earlier cocaine trafficking charges; and on August 9, 2006, the defendant pleaded guilty to a reduced charge of unlawful trafficking in Schedule W drugs.

Todd MacWhinnie, a 10-year veteran of the Lewiston Police Department currently assigned to the Maine Drug Enforcement Agency, drafted an affidavit based on this information and on his own knowledge and experience, to be presented to the Maine District Court in application for a search warrant. Government Exhibit. 2. The warrant was signed by John B. Beliveau, a judge of that court. Government Exhibit 1. After a briefing, MacWhinnie, Clifford,

and other law enforcement agents went to the defendant's residence. MacWhinnie and Clifford went to the rear of 20 Howe Street, where they knew the primary entrance to the defendant's apartment was located.

The defendant answered their knock on the door, and MacWhinnie told her that they had a search warrant for her apartment. The defendant let the officers in, and they waited for 10 to 15 minutes while she made arrangements for her four children to go to a nearby friend's house. Clifford then asked the defendant if they could go to a private area of the apartment while other agents searched it, and the defendant led the way to her bedroom. She and Clifford sat down in the bedroom.[1]

Clifford read the defendant the *Miranda*[2] warnings from a plastic card that he carried with him, a copy of which is Government Exhibit 4. He made sure that the defendant understood each line of the warning. He knew that she was a college student. She did not ask him to repeat any portion of the warning. She was not handcuffed, no voices were raised, and she was not threatened. Clifford gave the warning at this time because he was being overly cautious. The defendant agreed to answer questions after hearing the warning. Clifford told her, as is his custom, that her cooperation might result in the exercise of discretion by the prosecutor in terms of her sentence.

Clifford then asked the defendant whether she had something in the apartment that she should not have. The defendant replied that she had some pills and that they were in a drawer in a nightstand beside the bed. For safety reasons, she was not allowed to take the bag of pills out

---

[1] MacWhinnie testified that he was in the bedroom with Clifford and the defendant at all times. The defendant testified that MacWhinnie was not in the bedroom until a time after Clifford had asked her many questions and shortly before the questioning stopped. To the extent that it is necessary to resolve this conflict, I find MacWhinnie's testimony to be more credible.

[2] *Miranda v. Arizona*, 384 U.S. 486 (1966).

3

of the drawer, but the officers found them where she had said they would be. She told Clifford that she did not have a prescription for Oxycontin.

In response to questioning, the defendant first said that she did not know the name of her supplier. After repeated questions, she said that her supplier was Marcus, but that she did not know his last name and did not have a telephone number at which to reach him. She said that she had purchased Oxycontin from Marcus on at least two occasions, after he called her and told her where to meet him. She said that on one occasion she bought 100 tablets and on another she bought 300 tablets, for which Marcus charged $25 each.

According to the defendant, MacWhinnie first came into the bedroom after Clifford had asked her most of these questions, and, immediately upon entering the room, MacWhinnie told the defendant that, if she cooperated, the charges against her would remain in state rather than in federal court. MacWhinnie denied making any such promise or statement, and I credit his testimony, not least because, as an experienced police officer and after some time with the drug enforcement agency, he had to have known that the decision whether to charge a particular defendant in state or in federal court is not made by the arresting officers.

The defendant also testified that Clifford told her that the Department of Health and Human Services would be contacted about her children and mentioned her continuing as a college student. Clifford agreed that he made the statement about her children; the officers were required to contact the Department under the circumstances. He also agreed that he talked with the defendant about school, after they had left her bedroom. The defendant testified that both statements or comments implied that, unless she cooperated, her children would be taken from her and her college education discontinued. I do not find the inference that the defendant drew from these statements or remarks to be reasonable under the circumstances.

4

The defendant testified that Clifford read her the *Miranda* warnings only after he and MacWhinnie became frustrated with her responses to their questions and that they decided to arrest her because they were not satisfied with the answers she was giving them. She testified that she agreed to continue answering questions after the warnings were given, but that Clifford and MacWhinnie then "wrapped it up." To the extent that it matters when the *Miranda* warnings were given, it makes no sense that two experienced police officers would give the warning only after asking the majority, if not all, of the questions they posed to the defendant. By her version, the officers asked the defendant for very little information, if any, after the warnings were given.

The defendant had been taken to the county jail nine times before the events of June 17, 2010 that are recounted here.

Some or all of the law enforcement officers who were executing the search warrant at 20 Howe Street drew their weapons and held them pointing down at their sides before one officer knocked on the defendant's door. As soon as the officers saw that there were children in the apartment, they holstered their weapons. The defendant testified that she never saw any drawn guns that day.

The bedroom interview took about 15 minutes. After that, Clifford, MacWhinnie, and the defendant went back into the living area of the apartment while the search continued for a total of about an hour. The defendant was free to move around the apartment during the search, so long as she was accompanied by an officer for reasons of safety. She and Clifford, who knew the defendant from prior contacts, engaged in small talk during this period.

The evidence log from the search of the defendant's apartment on June 17, 2010, is Government Exhibit 3. After the search was completed, the defendant was arrested outside her apartment.

## II. Discussion

### A. The Search Warrant

The defendant contends that the search warrant for her residence was issued without probable cause because the affidavit submitted in support of the application for the search warrant did not adequately establish probable cause. Motion to Suppress ("Motion") (Docket No. 29) at 2-7. The sufficiency of an affidavit is a question of law, and the court looks only to the four corners of the affidavit to determine whether probable cause existed to issue the warrant. *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999). "Probable cause exists when the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed," *United States v. Schaefer*, 87 F.3d 563, 565 (1st Cir. 1996), or that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A state court judge's determination of probable cause is entitled to substantial deference. *United States v. Cameron*, 652 F.Supp.2d 74, 82 (D. Me. 2009).

A defendant bears the burden of proving the illegality of a warrant. *United States v. Clark*, Criminal No. 10-62-P-S, 2010 WL 4365562, at *9 (D. Me. Oct. 27, 2010). Here, the defendant does not contend that any false statements were made in the MacWhinnie affidavit. Rather, she attacks the credibility of the sole confidential informant mentioned in the affidavit. Motion at 5. She notes that the informant "had no prior law enforcement experience in providing reliable information[,]" no details were given about the "personal relationship" between the informant and the defendant, and the affidavit made "critical omissions of the facts that Defendant was raising four children at home and was a full-time college student, . . . which might have influenced the magistrate in Defendant's favor." *Id*.

First, how many children the defendant "was raising at home" and her full-time college student status are irrelevant to the question of whether evidence of a crime or contraband was located in the defendant's residence, which is the sole object of a search warrant. Any magistrate who was "influenced in [the d]efendant's favor" by such information would be acting wrongly. Next, if all information in an affidavit submitted in support of an application for a search warrant that comes from an informant can only come from an informant with a history of providing valid information to law enforcement, no such information could be submitted, as no informant could establish a history of reliability. In any event, the fact that the information comes from a single informant with no history as to reliability is not disqualifying, particularly when that information is confirmed, at least in part, by the affiant officer. *United States v. Widi*, 686 F.Supp.2d 107, 111 (D. Me. 2010).

That is what occurred here. In his affidavit, MacWhinnie stated that Clifford had made previous contact with the defendant at the address at which the informant said the defendant was living. MacWhinnie himself verified that tablets of the color described by the informant would, if they were Oxycontin, as the informant said, be sold by a dealer in Lewiston for a price corresponding to the $240 that the informant reported as changing hands during the observed sale, if three pills were sold. The informant was reported as being in a position to know the difference between various narcotics, including Oxycontin. The informant said that he or she had no criminal charges pending, and MacWhinnie confirmed this. Affidavit and Request for A Search Warrant ("Affidavit") (Govt. Exh. 2) ¶¶ 1-3, 5 at [2]-[4]. *See United States v. Greenburg*, 410 F.3d 63, 67 (1st Cir. 2005) (reliability of informant's information increases when police know informant's identity). MacWhinnie also learned that the defendant had been involved in drug-related cases on more than one occasion in the past. Affidavit ¶ 7. All of this information

7

supported the informant's veracity. *See generally Cameron*, 652 F.Supp.2d at 82 (specificity in affidavit lends credence to its assertions).

The defendant also complains that no details were given in the affidavit about the nature of the informant's "personal relationship" with her. The affidavit states that the informant provided Clifford with "details . . . about COY that only someone with [a personal] relationship would know." *Id*. ¶ 3. The affidavit might be more complete had Clifford reported more details about the nature of the informant's relationship with the defendant, assuming that he could do so without revealing the informant's identity, but that fact alone is not sufficient to invalidate the warrant. There is sufficient other information in the affidavit to support the judge's finding of probable cause.

In addition, a failure to take a certain investigative approach or to probe further does not amount to the reckless disregard of the truth that invalidates a warrant application. *United States v. Clifford*, No. CR 03-42-BW, 2003 WL 22063740, at *5 (D. Me. Sept. 4, 2003). This principle applies as well to the defendant's assertions that the nature of the informant's previous employment was necessary in order for the issuing judge to credit the assertions that the informant knew the difference between different types of narcotic pills due to that employment and that more surveillance of the defendant's resident might have determined "whether there was traffic[] consistent with drug dealing." Motion at 5, 6.

Contrary to the defendant's contention, *id.* at 6, the fact that the informant reported seeing a gallon-sized plastic bag full of tablets as many as four days before the affidavit was presented to the judge is not "unpersuasive" support for a finding that it was more probable than not that such pills would still be in the residence. Nor is MacWhinnie's surmise that the "few" pills that the informant saw the defendant sell for $240 were three 80-milligram Oxycontin pills, given the

8

informant's description of the pills and MacWhinnie's knowledge of the appearance and street price of such pills, as set out in the affidavit, of "no evidentiary value." *Id.* There is no sense in which this information was stale.

Because I conclude that the affidavit sufficiently established probable cause, I do not reach the government's alternative argument, that the officers relied on the warrant in good faith. Government's Objection to Defendant's Motion to Suppress (Docket No. 33) at 8-11.

### B. The Defendant's Statements

The defendant contends that her answers to the questions of Clifford and MacWhinnie in her bedroom were involuntary and violated *Miranda*. Motion at 7-9. She also argues that she was threatened and improperly induced to make those statements. *Id.* at 9.

The government bears the burden of proving *Miranda* compliance. *See, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992). The obligation of an officer to administer *Miranda* warnings attaches "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994 (citations and internal quotation marks omitted). Whether a person can be considered to have been in custody depends on all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.* (citation omitted).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 323. *See also Untied States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (relevant inquiry "is how a reasonable man in the suspect's position would have understood his situation") (citation and internal quotation marks omitted). "Among the factors to

9

consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted).

In this case, however, it is not necessary to determine whether the defendant was in custody when she was questioned by Clifford and MacWhinnie, because I credit their testimony that Clifford read the *Miranda* warnings to the defendant, and she agreed to speak with him, before he asked her any questions. The defendant's testimony that Clifford only read her the *Miranda* warning after he had finished questioning her makes no sense; no experienced law enforcement officer would give the warnings after completing his questioning and then immediately "wrap up" the questioning, unless some other event intervened or he was immediately going to arrest the person being questioned, neither of which occurred in this case.

The defendant testified that MacWhinnie only joined her and Clifford in her bedroom after she had told Clifford that there were illegal drugs in the drawer of the nightstand beside her bed and that MacWhinnie said, immediately upon entering the room, that if she cooperated with the officers, any charges against her would remain in state court rather than "escalating" to the federal level. It is apparently this alleged statement that she characterizes as an improper inducement.

First, it is important to note that the statement, coming by the defendant's own testimony after she had pointed out the Oxycontin, cannot immunize her earlier actions and statements, however the statement by MacWhinnie may be characterized. To the extent that this characterization, if adopted by the court, would render inadmissible any subsequent statements

10

that the defendant might have made, I accept MacWhinnie's testimony that he made no such statement. As an experienced law enforcement officer, MacWhinnie knew that he could not control whether charges were brought against the defendant in state or federal court. At most, he could advocate for prosecution in state court, but that is not what the defendant testified that he said. She testified that MacWhinnie made her a promise that he had no power to make.

The defendant also testified that Clifford told her that the state Department of Health and Human Services would be contacted about her children, and mentioned her continuing her college education, and that she took these statements to imply that, if she cooperated, the department and the university would not be notified. Both Clifford and MacWhinnie testified that they were required to notify the Department under the circumstances – execution of a search warrant resulting in the seizure of the Oxycontin – and denied threatening to inform the University of Southern Maine about the events of that day. Clifford testified that he only discussed college with the defendant while making small talk after he stopped asking her questions and she had returned to the living room of her apartment to wait for the completion of the search. He testified that the search took about 1.25 hours, only 10-15 minutes of which were spent in her bedroom. It is not what the defendant assumed that the officers meant to imply from their remarks that governs; it is what a reasonable person would have drawn from them. I conclude that the defendant could not have reasonably construed the officers' remarks as threats.

These are the only statements about which the defendant testified that could possibly be considered threatening or inducing. Given her familiarity with the criminal justice system, I find it unlikely that the defendant's will was overborne, *see, e.g., United States v. Vega-Figueroa*, 234 F.3d 744, 749-50 (1st Cir. 2000), at any time, even if events transpired as she described, which I find unlikely.

Even if the defendant's testimony were fully credited, she was not in custody when she answered Clifford's questions. She was in her own bedroom; she was with only one officer for most of the questioning, and then with only two; she was not handcuffed or physically restrained; and the questioning lasted 10-15 minutes. In his oral argument, counsel for the defendant contended that the defendant was in custody from the moment she opened her door to the officers' knock, because "clearly with five or six officers coming in at gunpoint she was not free to leave." The defendant's own testimony was that she did not see any drawn guns at any time. Clifford, the only witness who testified that some of the officers had taken their guns out of their holsters before the door was opened, also testified that the guns were re-holstered as soon as it became apparent that there were children in the apartment. Counsel's argument significantly overstated the facts in this regard.

### III. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 3rd day of February, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge